

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NELSON SHANKS
1163 State Road
Andalusia, PA 19020

v.

LESLIE and ABIGAIL WEXNER, h/w
One Whitebarn Road
New Albany, OH 43054

and

JEFFREY E. EPSTEIN, individually
and d/b/a J. EPSTEIN AND
COMPANY, INC.
The Villard House
457 Madison Avenue, 4th Floor
New York, NY 10022

and

GHISLAINE MAXWELL
The Villard House
457 Madison Avenue, 4th Floor
New York, NY 10022

Case No. 02-7671

## COMPLAINT

### I. PARTIES

1. Plaintiff, Nelson Shanks ("Shanks"), is a citizen of the Commonwealth of Pennsylvania, and at all relevant times, resided at 1163 State Road, Andalusia, Bucks County, Pennsylvania 19020.

2. Defendants, Leslie and Abigail Wexner (the "Wexners"), are husband and wife. At all relevant times, the Wexners were citizens of the State of Ohio and resided at One Whitebarn Road, New Albany, Ohio 43054.

3. Defendant, Jeffrey E. Epstein, is a resident and citizen of the State of New York. Jeffrey E. Epstein, was at all

relevant times, a principal and an officer of Defendant, J. Epstein and Company, Inc. (collectively "Epstein"), which, at all relevant times, had its principal place of business at The Villard House, 457 Madison Avenue, New York, New York 10022.

4. Defendant, J. Epstein and Company, Inc. was, at all relevant times, a corporation organized and existing under the laws of the State of New York, with its principal place of business at The Villard House, 457 Madison Avenue, New York, New York 10022.

5. Defendant, Ghislaine Maxwell ("Maxwell"), is, upon information and belief, a resident and citizen of the State of New York, and at all relevant times hereto, has acted as the actual, apparent and/or ostensible agent for Epstein and/or the Wexners, and, at all relevant times, conducted business from 457 Madison Avenue, New York, New York 10022.

## II. JURISDICTION AND VENUE

6. Subject matter jurisdiction is conferred upon this Court pursuant to provisions of 28 U.S.C. §1332 in that there is diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

7. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to this claim occurred in the Eastern District of Pennsylvania.

## III. FACTS

8. In early 2000, Shanks was contacted by Maxwell, who represented to Shanks that she was acting on behalf of Epstein and/or the Wexners, to inquire whether Shanks would consider accepting a commission to paint a family portrait of Abigail Wexner and her four children.

9. During subsequent conversations between Shanks and Maxwell, Maxwell informed Shanks that the Wexners had specifically requested that Shanks be commissioned to paint a family portrait because of Shanks' reputation, talent, painting style, acclaim, notoriety and status as a world renowned artist.

10. Shanks has received critical acclaim for his paintings and portraits which include subjects such as Margaret Thatcher, Luciano Pavarotti, Princess Diana, Ronald Reagan, and Bill Clinton, to name only a few.

11. Conversations between Shanks and Maxwell culminated in a personal meeting between Shanks and Abigail Wexner in New York City on or about March 15, 2000.

12. The visit between Shanks and Abigail Wexner in New York City was arranged by Abigail Wexner's personal assistant, Karl W. Koon.

13. Following the March 15, 2002 visit between Shanks and Abigail Wexner, Shanks was invited to the Wexner Estate in New Albany, Ohio for purposes relating to the proposed portrait.

14. Shanks traveled to the Wexner Estate on or about April 26, 2000, at the expense of the Wexners. The arrangements were made by Abigail Wexner's personal assistant, Karl W. Koon. A true and correct copy of letters between Shanks and Abigail Wexner, together with Shanks' itinerary, is attached hereto at Exhibit "A".

15. During Shanks' visit to the Wexner Estate, Shanks spent two days photographing Wexner, her four children, and various settings. The resulting photographs would, pursuant to Abigail Wexner's express direction and consent, form the basis of the planned portrait.

16. Shanks spent approximately two days at the Wexner Estate during which time he was given limited access to Abigail Wexner and her children. Notwithstanding such limited access, Shanks was able to take approximately 300 still photographs of Abigail Wexner and her children and observed, to the extent allowed, the children in their home environment, interacting with each other and their mother. A representative sample of photographs taken by Shanks during his visit to the Wexner Estate is attached hereto as Exhibit "B".

17. Following the April 26, 2000 visit to the Wexner Estate, Shanks confirmed in writing to Abigail Wexner in a letter dated May 3, 2000, that he was pleased with the photographs he took during the visit, and that he was contemplating the use of a large 6' x 6' format for the painting. A true and correct copy of the May 3, 2000 letter from Shanks to Abigail Wexner is attached hereto as Exhibit "C".

18. By fax dated May 4, 2000, Abigail Wexner, through her assistant, Amy Roberts, provided Shanks, at his request, with the measurements of her four children and herself, which measurements provided Shanks with additional information about Abigail Wexner and her children for purposes of composing the painting. See Exhibit "D".

19. At no time did the Wexners, Maxwell or Epstein request to have any involvement in the creative process such as selection of photographs upon which the painting would be based, or composition of the painting.

20. By letter dated May 16, 2000, Maxwell, acting as the actual, apparent or ostensible agent of Epstein and/or Wexner, confirmed that the cost of the painting would be $325,000.00. A true and correct copy of the May 16, 2002 letter from Maxwell to Shanks is attached hereto as Exhibit "E".

21. Thereafter, in reliance on the conduct, actions, words, promises, contracts, and contractual representations of Maxwell, Epstein and the Wexners, Shanks commenced work on the portrait. During the following months, Shanks expended hundreds of hours on the Wexner family portrait.

22. On or about October 23, 2000, while the painting was in progress, Shanks communicated to Maxwell that he proposed using an antique mid-18th century picture frame for the painting, which was later agreed upon for the price of $14,000.00. A true and correct copy of the October 23, 2002 letter from Shanks to Maxwell is attached hereto as Exhibit "F".

23. On many occasions while the painting was in progress, Shanks invited the Wexners and/or Maxwell to visit Shanks' studio to see the progression of the portrait and provide comments relative to same. The Wexners and Maxwell declined all such invitations.

24. During late April 2001, the painting was completed after which the Wexners dispatched their own courier to pick up the painting at Shanks' studio in Andalusia, Bucks County, Pennsylvania. A true and correct representation of the painting is attached hereto as Exhibit "G".

25. In early May 2001, after the painting was delivered to the Wexners, Shanks received communications from the assistants and/or agents of the Wexners that the Wexners had made certain subjective comments about the painting, in particular, comments regarding their apparent dissatisfaction with the poses of the

-4-

children, their relative ages and sizes as portrayed, and expressions of the subjects, including Abigail Wexner herself.

26. Shanks attempted to assuage the Wexner's concerns, by explaining certain elements of the creative process that an artist, such as Shanks, employs in rendering a portrait such as that which was commissioned and tendered upon completion.

27. On May 9, 2001, Shanks invoiced the Wexners for the painting in the agreed upon amount of $325,000.00, $14,000.00 for the antique frame and $900.00 for the crate and packing. A true and correct copy of the invoice dated May 9, 2001 is attached hereto as Exhibit "H".

28. At all times the Wexners and/or Epstein have refused to pay the afore-referenced invoice as agreed.

29. Implicit in the contract and/or course of conduct and communication between Shanks and the Wexners and/or Epstein was Shanks' "creative license" to interpret the subjects and portray them in an artistic fashion.

30. At no time did Shanks contract, explicitly or implicitly, to portray the subjects with "photo realism" as one would expect from a photographic rendering of the subjects.

31. Shanks' unique and widely acclaimed style of painting is well represented in the portrait of Abigail Wexner and her four children.

## COUNT I
## SHANKS v. THE WEXNERS AND EPSTEIN
## BREACH OF CONTRACT

32. Plaintiff incorporates by reference Paragraphs 1 through 31 as though fully set forth herein and at length.

33. Epstein, by and through his actual, apparent and/or ostensible agent, Maxwell, contracted with Shanks to create a painting of Abigail Wexner and her four children in a manner consistent with the style, workmanship and quality customary of Shanks.

34. In the alternative, the Wexners, by and through their actual, apparent and/or ostensible agents, Maxwell and Epstein,

-5-

contracted with Shanks to create a painting of Abigail Wexner and her four children in a manner consistent with the style, workmanship and quality customary of Shanks.

35. By letter dated May 16, 2000, Maxwell, acting as the actual, apparent and/or ostensible agent of Epstein and/or the Wexners, confirmed in writing the agreement between Shanks and Epstein and/or the Wexners, that in exchange for delivering a painting of Abigail Wexner and her four children, Epstein and/or the Wexners would pay Shanks $325,000.00.

36. In or about late April, 2001, Shanks tendered to the Wexners, at the behest of Epstein and/or Maxwell, the subject painting, the tender of which was accepted by Epstein and/or the Wexners at Shanks' studio in Andalusia, Bucks County, Pennsylvania.

37. The subsequent attempts by Epstein and/or the Wexners to reject the painting were based on purely subjective grounds.

38. Subjective approval of the painting by the Wexners, Maxwell, and/or Epstein was not a condition precedent to payment by Epstein and/or the Wexners to Shanks pursuant to the agreement between them.

39. The painting was completed in a professional and artistic manner, consistent with Shanks' style, which was well known to Epstein, Maxwell and/or the Wexners.

40. At all times relevant hereto, Epstein and/or the Wexners have refused to pay the agreed upon amount of $325,000.00, plus $14,000.00 for the antique frame, together with $900.00 for crate and packing for a total amount of $339,900.00, as represented in the May 9, 2001 invoice.

WHEREFORE, Plaintiff, Nelson Shanks demands judgment against Defendants Epstein and Maxwell, individually, jointly and/or severally, for the sum of $339,900.00, plus interest at the legal rate and exclusive of costs, and any other damages or relief that this Court may deem appropriate and just.

## COUNT II
## SHANKS v. ALL DEFENDANTS
## PROMISSORY ESTOPPEL

41. Plaintiff incorporates by reference Paragraphs 1 through 40 as though fully set forth herein and at length.

-6-

42. The words, conduct, deeds, actions and/or inactions of Maxwell, Epstein, and/or the Wexners, individually, or in concert, or as principal and agent, induced Shanks to act to his detriment by expending hundreds of hours in the course of creating the painting for the benefit of the Wexners and/or Epstein.

43. Shanks justifiably relied on the words, deeds, conduct, actions, or inactions of Maxwell, Epstein and/or the Wexners in expending hundreds of hours to complete the painting of the Wexner family.

44. Specifically, Defendants gave Shanks free reign to compose the painting, to select photographs upon which the painting would be based, and declined to give Shanks any direction whatever as to the ultimate composition of the painting.

45. By the words, conduct, deeds, actions or inactions of Defendants, or any of them, Shanks reasonably believed that he was given creative license to produce the painting of the Wexner family consistent with his own unique style of painting, and consistent with prior works which were known to and viewed by the Defendants.

46. Absent the specific words, conduct, deeds, actions or inactions of Defendants, or any of them, Shanks would not have proceeded to expend hundreds of hours to complete the painting of the Wexner family.

47. As the result of the inducements of the Defendants, or any of them, upon which Shanks reasonably relied, manifest injustice would result if Shanks is not paid for the time and materials he expended in completing the painting of the Wexner family, which time is valued in excess of $325,000.00.

WHEREFORE, Plaintiff, Nelson Shanks demands judgment against Defendants Epstein and Maxwell, and the Wexners, individually, jointly and/or severally, for a sum in excess of $325,000.00, exclusive of interest, costs, and any other damages or relief that this Court may deem appropriate and just.

Date: October 2, 2002

Jeffrey D. Hofferman
Bradford M. Brush
GOLLATZ, GRIFFIN & EWING, P.C.
Sixteenth Floor
Two Penn Center Plaza
Philadelphia, PA 19102
Attorneys for Nelson Shanks

-8-